SCHOSTAK v. FIRST LIQUIDATING CORPORATION.

1. BROKERS—NONEXCLUSIVE LISTING—COMMISSIONS.

In order that a real estate broker may be entitled to a commission under a nonexclusive listing agreement he must prove that he produced a purchaser ready, able and willing to buy on the terms of the listing or on terms agreeable to the owner or, in the alternative, that the sale to the broker's prospective purchaser was prevented by the owner's bad-faith termination of pending negotiations.

2. SAME—COMMISSIONS.

In the absence of a contract providing otherwise, the nonconsummation of a transaction due to the fault of the principal does not deprive the broker of his right to compensation.

3. SAME—COMMISSIONS—REVOCATION OF AUTHORITY—FRAUD.

A broker's right to agreed commission for the sale of land is not defeated if the principal in wrongfully revoking his

Time for accomplishing specified result, see 2 Restatement, Agency, § 446.

Revocation of real estate broker's authority, see 2 Restatement, Agency, § 454.

authority or in withdrawing the property offered for sale is actuated by the fraudulent motive of avoiding the payment thereof.

4. SAME—COMMISSIONS—CHANGING TERMS.

A principal cannot prevent the recovery of commissions by changing the terms which were originally proposed to the broker and upon which the latter has secured a buyer.

5. SAME—COMMISSIONS—REVOCATION OF AUTHORITY.

In order that a revocation of a broker's authority may defeat his right to commissions or other compensation it must be made in good faith and not as a mere device to appropriate the benefit of his services and efforts and at the same time escape the payment of commissions earned or about to be earned.

6. SAME—COMMISSIONS—TIME—REVOCATION OF AUTHORITY.

When no time is agreed upon, a broker is entitled to a reasonable time in which to get results and the principal cannot even revoke the authority within that time unless it is done in good faith and not to escape paying commissions.

7. SAME—COMMISSIONS—TERMINATION   OF   NEGOTIATIONS—GOOD FAITH—SALE TO ANOTHER.

Where negotiations between defendant liquidating trustee and plaintiff broker's prospective purchaser for sale of large office building had continued for eight days and were then terminated by reason of sale to another party with whom negotiations of which plaintiff had been advised were being conducted and there had been no meeting of the minds as to contract for sale between defendant and plaintiff's prospect, plaintiff was not entitled to commission, where termination of negotiations was not made in bad faith nor to avoid payment of commission.

Appeal from Wayne; Maher (Thomas F.), J. Submitted January 6, 1948. (Docket No. 6, Calendar No. 43,856.) Decided April 5, 1948. Rehearing denied May 18, 1948.

Assumpsit by Louis H. Schostak, doing business as Schostak Brothers & Company, against First Liquidating Corporation, a Michigan corporation, for commissions claimed to be due on a real estate transaction. Judgment for defendant. Plaintiff appeals. Affirmed.

*Shapero & Shapero,* for plaintiff.

*Bodman, Longley, Bogle, Middleton & Armstrong*
(*Henry C. Bogle,* of counsel), for defendant.

North, J.   Plaintiff, a Detroit real estate broker,
brought this suit to recover commission on the basis·
of a nonexclusive listing given him by defendant for
the sale of the 25-story National Bank Building in
Detroit.   The listing was in the form of a letter
written by defendant to plaintiff, which reads:

"We wish to confirm our recent conversation with
your representatives in which you were advised that
we would pay a commission of 1½ per cent. on the
gross sale price of the property commonly known as
the National Bank Building and located at the corner
of Woodward Avenue and Cadillac Square, Detroit,
Michigan.
"This property is listed for sale by us at
$6,000,000.  The commission will be paid to you only
upon such sale as is actually produced by you, and
in no sense.is this arrangement to be considered or
construed as an exclusive listing or option."

Simultaneously defendant delivered to plaintiff
at his request, in the form of a letter, additional
information, including statements as to manner of
operation of the building, that a purchase would be
on the basis of fee title of the property, subject to
rental, tax, insurance, et cetera, to be adjusted as
of the date of closing the sale, that defendant would
retain its personal property located in the building,
also the cash on hand in its operating corporation,
accounts receivable, but would be responsible for its
outstanding liabilities such as accounts payable.
Therein was also given a list of some of the out-
standing long-term leases, the rates of rental per
square foot, and items of cost of operating the build-

ing. It was understood by plaintiff and the parties concerned in the later negotiations that the transaction included not only the sale of the real estate but also of an attendant going business.

On trial in the circuit court without a jury defendant had judgment. Plaintiff has appealed. Successful prosecution of plaintiff's case required him to prove that he produced a purchaser ready, able and willing to buy on the terms of plaintiff's listing or on terms agreeable to defendant; or, in the alternative, that the sale to plaintiff's prospective purchaser was prevented by defendant's bad-faith termination of pending negotiations. The circuit judge after hearing the case at length decided that plaintiff had failed in the above particulars and rendered judgment accordingly.

Plaintiff's prospective purchaser was the General Realty & Utilities Corporation of New York. After the representatives of the defendant owner and of the prospective purchaser were brought together all negotiations were conducted directly between them without any participation on the part of plaintiff. While negotiations were pending and before the parties were able to agree upon all the essential terms of the sale the negotiations were terminated by defendant. On this appeal plaintiff takes the position that "because defendant unreasonably thwarted the closing by selling the property to a third party while the negotiations for closing with the purchaser were still proceeding," plaintiff is entitled to recover. Thus the issue squarely presented is this: Did defendant act within its legal rights when it terminated negotiations with plaintiff's prospective purchaser on March 15 or 16, 1946?

Without implying that we are in full accord therewith, we quote in a more amplified form plaintiff's theory of his right to recover, as stated in his brief:

"1.  Where a broker has been employed under a nonexclusive agreement and the broker has secured a prospective purchaser with whom the owner has commenced to negotiate, and the closing has proceeded to the point that general agreement is reached between the owner and the purchaser as to the price and terms of payment, the owner has the duty to the broker to deal fairly with the purchaser in all details relating to the closing, so as not to unreasonably prevent its consummation; and if the owner, while negotiations are still pending, sells the property to another without notice to broker or purchaser and without giving the purchaser an opportunity to close the broker is entitled to recover his commissions.

"2.  Where the owner agrees with the purchaser to hold the property for him until a certain date and thereafter proceeds to close the sale and by act and deed extends the time thereof and then, while such closing is proceeding, without notice or further opportunity to the purchaser sells to a third person, the broker is entitled to recover his commission."

An abbreviated statement of the factual situation is sufficient.  Following contact brought about by plaintiff between defendant and the prospective purchaser, active negotiations looking to consummation of a sale began between the parties on March 8, 1946. While others in behalf of the respective parties participated in the negotiations, primarily defendant was represented by its president—Mr. Zur Schmiede, and the prospective buyer by Mr. Wagner.  On March 8th, Wagner came from New York and negotiations were taken up in Detroit with Zur Schmiede.  The latter agreed to hold the matter open until March 14th, to enable the purchaser's board of directors to take action authorizing the prospective purchase.  Such action was taken and Wagner, together with officers of the purchasing

corporation, arrived in Detroit March 14th. That afternoon negotiations were resumed including a detailed consideration of a contract which had been prepared by attorney Klein of Detroit, who had been retained in this matter by the prospective purchaser. During the negotiations, which were continued until late that evening and were renewed the following afternoon, numerous controversial details of the sale developed and were discussed. For example, it developed that defendant did not have title to a portion of an alley over which its building had been constructed, that a Mr. Goldstone, who had inspected the building in behalf of the prospective purchaser, had discovered that the steel beams in a portion of the building were affected by a rust condition which it was thought might impair the structural integrity of the building, that there was a question as to which of the parties should pay approximately $90,000 for extensive alterations required to meet the needs of a prospective tenant, also a question as to possible cancellation of an outstanding contract for improvement of elevators in the building, and there developed disagreement as to how much time the prospective purchaser should have in which to examine and pass upon the abstract of title, but according to some testimony 20 days was finally agreed upon and it is not claimed that this latter controversial matter blocked a sale.

There can be no question but that at the close of the conference on March 15th the parties had as yet failed to agree upon important details of a contract for the sale. It was simply a case wherein negotiations were still in progress. Perhaps the issue which particularly stood in the way of consummating the sale was the rust condition of structural steel in the building. None of the parties seem to have had any reliable information at that time as to how se-

rious or how costly a matter was presented by this rust condition, or to what extent it impaired the structural strength of the building. At least the prospective buyer did not, and in consequence was unwilling to contract to accept the building "as is." Mr. Wagner wanted to have an expert come from New York, in the light of whose judgment the prospective purchaser would determine whether or not it would assume the attendant risk. The negotiations were suspended in the afternoon of the 15th without the defendant herein consenting to the delay incident to procuring an inspection and report by the New York expert as to the condition of the building. As the matter stood at that stage of the negotiations it was still an open question as to whether the parties would be able to agree upon terms of a contract for the sale of the property. But the parties arranged that they would get together again at 9:30 on the morning of the 16th and continue the negotiations.

On March 13th, the defendant had received an offer from one Silberstein to purchase the property for $5,910,000, with a deposit which was good until noon of March 19th. On the evening of the 15th Zur Schmiede contacted Silberstein and made an appointment with him which resulted in the signing of a contract that evening, but dated March 16th, for the sale of the property "as is, in their present condition" to Silberstein for the price above noted. The following morning, March 16th, Zur Schmiede went to the office of attorney Klein and informed him, and, also, the representatives of plaintiff's prospective purchaser, who came to Klein's office later, that the deal with the General Realty & Utilities Corporation of New York was off.

Thus the legal issue presented is as to whether, under the circumstances of this case, defendant in

terminating negotiations with plaintiff's prospective purchaser acted within its legal rights, or whether on the contrary, as plaintiff herein asserts, in discontinuing negotiations with plaintiff's prospective purchaser defendant herein acted in bad faith, and thereby deprived plaintiff of a commission for the sale of this property to which he was lawfully entitled.

In passing upon the above issue it is important to have the following in mind. Defendant held title to the National Bank building merely as a liquidating trustee of the First National Bank of Detroit, and obviously its duty was to dispose of the property with reasonable promptness and on the most favorable terms obtainable. In its sale to Silberstein defendant was not required to pay a commission. Hence, from a financial standpoint defendant neither gained nor lost by selling to Silberstein for $5,910,000 instead of to plaintiff's prospective purchaser for $6,000,000, which would have incurred payment of a $90,000 commission. Hence, an inference of bad faith cannot be drawn by assuming an attempt on defendant's part to gain financially. While defendant did not inform plaintiff's prospective purchaser of Silberstein's pending offer, nonetheless in the course of the negotiations plaintiff's prospective purchaser was repeatedly advised of the necessity of prompt action. For example, Mr. Zur Schmiede on March 8th, said to Mr. Wagner, "we have people dealing on this property, and we just simply cannot overlook an opportunity to sell the building." Defendant did not sell to a purchaser who in any sense was procured by plaintiff, and in that respect certain cases cited in plaintiff's brief are not at all in point. A binding written memorandum of sale was never executed by plaintiff's prospective purchaser and defendant, nor did

plaintiff's prospective purchaser ever even orally agree or offer to purchase on the terms of plaintiff's listing. Instead the negotiations were on the basis of a sale including certain personal property of defendant which was expressly "excluded from the sale" under the "additional information" furnished plaintiff simultaneously with his listing. And it would seem that by having made the concession as to including such personal property defendant evidenced good faith in an effort to close the sale with the prospect produced by plaintiff. Nor can it be overlooked that the listing given by defendant to plaintiff expressly provided:

"The commission will be paid to you only upon such sale as is actually produced by you, and in no sense is this arrangement to be considered or construed as an exclusive listing or option."

Without attempting to review or note all of the multiplicity of authorities bearing upon decision of cases of this type, we are content to note that in general terms the applicable law is as follows:

"If plaintiff (the broker) fully performed on his part and defendant's malconduct rendered it impossible to make 'settlement of the sale' according to the land contract he had signed, he is estopped from taking advantage of his own wrong." *Greenberg* v. *Sakwinski,* 211 Mich. 498, 504.

"In the absence of a contract providing otherwise, the nonconsummation of a transaction due to the fault of the principal does not deprive the broker of his right to compensation." 12 C. J. S. p. 221.

"It is a rule of universal recognition that the principal must act in good faith toward the broker, and in the event of his failure to do so the broker will not be deprived of his commissions solely by reason of his employer's breach of duty. * * * Thus, a

broker's right to the remuneration agreed upon is not defeated if his principal in wrongfully revoking his authority or in withdrawing the property offered for sale is actuated by the fraudulent motive of avoiding the payment thereof. * * * Nor can an employer prevent the recovery of commissions by changing the terms which were originally proposed to the broker *and upon which the latter has secured a buyer.*'' 8 Am. Jur. p. 1066.

"In order that a revocation of a broker's authority may defeat his right to commissions or other compensation it must be made in good faith and not as a mere device to appropriate the benefit of his services and efforts and at the same time escape the payment of commissions earned or about to be earned.'' 12 C. J. S. p. 151.

"It is a well-established rule of law that, when no time is agreed upon, a broker is entitled to a reasonable time in which to get results, and the principal cannot even revoke the authority within that time, unless it is done in good faith, and not to escape paying commissions.'' *Friedenwald v. Welch,* 174 Mich. 399.

"Where no definite term is fixed by the contract of employment a real estate broker has a reasonable time in which to effect a sale. Thereafter the principal may terminate his authority and relieve himself from liability unless such action is taken in bad faith for the purpose of depriving the broker of the fruits of his labor when it was about to prove effectual.'' *Goodman v. Marcol, Inc.* (syllabus), 261 N. Y. 188 (184 N. E. 755, 88 A. L. R. 714).

The foregoing seems to be largely summed up in the following:

"The right of a broker to a commission is fixed at the time of his discharge in good faith. It depends on whether he has done the thing he under-

took to do before his authority was terminated. * * * As applied to the ordinary contract of employment to sell property, for which there is no consideration other than the commission to be paid the broker and which may be considered as a mere offer that does not become an enforceable contract until it is performed by the broker, the rule means that where the owner in good faith revokes the agency or authority or withdraws the offer before the broker procures a purchaser ready, willing and able to purchase on the owner's terms, the broker is not entitled to compensation for procuring a purchaser thereafter or to a commission on a subsequent sale by the owner.

"Conversely, the owner cannot defeat the right of the broker to a commission or other compensation by terminating the agency after the broker has procured a purchaser ready, willing, and able to buy the property on the terms suggested by the owner and has communicated that fact to the owner." 12 C. J. S. p. 150.

A meeting of minds between defendant and plaintiff's prospective purchaser was never accomplished. As hereinbefore noted, active negotiations looking to the consummation of a sale to plaintiff's prospective purchaser began on March 8th and were continued to and including March 15th, and defendant actively participated in such negotiations in an obviously good-faith effort to consummate a sale. We think the conclusion is unavoidable that under the circumstances of this case plaintiff herein was given a reasonable time and opportunity within which to close the sale. Especially is this true since defendant had an offer from another prospective buyer which was good only until March 19th. If as much time were consumed with that prospective buyer as with plaintiff's prospect in reaching an agreement as to details of the sale, the limited time, which in-

cluded an intervening Sunday, to March 19th was fast expiring. As a matter of fact the record discloses that the ultimate sales contract with Silberstein was not finally consummated until March 18th.

It conclusively appears from this record that plaintiff did not produce a purchaser who was ready, willing and able to purchase the property on the terms of the listing given by defendant to plaintiff. The trial judge who heard and considered the testimony which is set forth in substantially 800 pages of the printed record, in his opinion said: "It is the court's opinion that they were no closer to a deal at that time (March 15th), if not further from a deal, than when they started, and that the plaintiff's prospective purchaser, acting through Mr. Wagner, never at any time made any offer to buy on the defendant's terms." The record abundantly establishes the fact that in terminating the negotiations on the morning of March 16th with plaintiff's prospective purchaser, defendant did not act in bad faith, nor in so doing was defendant motivated by a desire to avoid payment of a commission. As hereinbefore noted a savings of that character was not accomplished by defendant's sale to Silberstein. Defendant did not reap any benefit from plaintiff's efforts. In terminating the negotiations with plaintiff's prospective purchaser defendant acted within its legal rights; and plaintiff, under the record in this case, is not entitled to recover.

In view of our conclusion herein it is unnecessary to pass upon defendant's cross appeal. The judgment entered in the circuit court is affirmed, with costs to appellee.

BUSHNELL, C. J., and SHARPE, BOYLES, REID, DETHMERS, BUTZEL, and CARR, JJ., concurred.